Good morning. This morning, Judge Mannion and I are so privileged to have Judge Coleman, Sharon Coleman, from the District Court of the Northern District of Illinois sitting with us. You'll see, she's just wonderful. And I think everybody is right. And well, we'll get started. Okay. Our first case is Appeal Number 17-1089 and it's Higher Society of Indiana v. Tippecanoe County. And good morning. Mr. Mastin, yes? I'm sorry. May it please the Court, I'm Doug Mastin. I represent Tippecanoe County, Indiana. We're here asking that the Court reverse the District Court's order in joining Tippecanoe County from enforcing its policy on events at the Tippecanoe County Courthouse. There are two kinds of events that we're going to talk about. One are sponsored events and then there are some private unsponsored events. With respect to the sponsored events, the County is, we contend, not acting as a mere forum provider. It's acting as a speaker. And the County's event policy is not used as a weapon to stifle Higher Society speech. Could you give me a fact answer, which is, if you know, how big are the courthouse grounds themselves versus the area available on the surrounding sidewalks? I became a lawyer because I wouldn't have made a very good engineer. It's sort of a normal city sidewalk. I don't suppose that much different from what's outside here in terms of that width. The courthouse grounds, I'm guessing here I'm bad with dimensions. What if you describe the perimeter? Because a lot of Indiana courthouses are like this. They've got four entrances, one of yours is closed. But do the sidewalks border the surrounding streets? Right, so you've got the streets, you've got four downtown streets, you've got sort of an ordinary city sidewalk. For most of the grounds, it's bordered by a limestone knee wall, I guess it would be called. And then you have grassy areas leading up to the four entrances of the courthouse, which are, they all look kind of the same, but functionally only one's open for the public. One's open for prisoners to come in, I think one's pretty much closed entirely, and the fourth one is lawyers can get in with a... Yeah, that's when everybody goes in now. Right. What I'm trying to figure out is what is included in grounds? So the grounds will be everything from the courthouse doors through the sidewalks to the knee wall, which is the border of the courthouse grounds. And then the city sidewalks that are outside of the knee wall that go around all four blocks... What are you calling that, the new wall? What did you call it? I'm sorry, I'm calling it a knee wall, and it's just sort of a retaining wall that's about knee height around most, around a lot of the courthouse. Although I suppose one side, the wall goes up above your head, and then there's stairways kind of coming up on either side. So what needs a permit? Anything inside, it's not exactly a permit. The new wall, inside the new wall? Inside the knee wall, inside the retaining wall. Anything from that wall outside, which is the city sidewalks, we regard as a traditional public forum that anybody can be on. Okay. You're not talking about a cement patio type of thing, right? Well... So there's no patio where these functions happen. There's the grassy, like, knoll almost. There are areas where the wall stops, and then there are a couple of small steps that do come up on, I think, two of the sides. It is kind of a patio, but it's demarked where you can tell it's separate from the surrounding sidewalk, which I think is somewhat significant. There's the district court decision, or I'm sorry, the circuit decision out in D.C. about the Supreme Court Plaza, and you had a Supreme Court case where they said the sidewalks around the Supreme Court are public forums. I have an idea. Why don't you supplement the record with a photograph?  Yeah, but it's hard to tell the footage, et cetera. In the pictures? I'm not very spatial. Okay. Well, we'll go on. All right. So you insist that the private events on the courthouse steps and grounds have been limited. Right. And consisted with a county purpose. But the invocation of those words, a county purpose, is really just another way of saying that it happened to convey a message the county agreed with. Right? And I'm wondering how that's distinct from a viewpoint discrimination. So the sponsored events are certainly events that the county agreed with, and that's why they picked them. I think the private events are somewhat separate because they did not receive permission to be there, and what's more, higher society received the same or better treatment than those private events. They had their four-hour ceremony, and then two weeks later they were looking to come back again. So they got the same or more as those private events. But Round the Fountain Art Fair, which is the main one we're concerned about, because I think the county would exclude all the other ones if they could still keep that one. So I'll try to get back to the importance of the art fair to the county. Wait a minute. Excuse me. You said you think the county would exclude all the other ones? What other ones if they could go back? The League of Women Voters? I think they would have. Back in 1999, they were considering just closing down the whole Courthouse Grounds to events, and they would have done that to have a clear legal standard, so they didn't have me here today. Oh, you'd be here. The one that they couldn't see letting go of was the Round the Fountain Art Fair, which had been started in the 70s after somebody, a consultant, had suggested destroying the courthouse and rebuilding would be a way to revitalize the downtown. So a group of community-minded people took it upon themselves to start organizing this art fair to revitalize the downtown a little bit and celebrate the art of the courthouse, and they've been contributing art to the—there's a permanent collection of art in the courthouse. There's a—there's a— I didn't point at that. There is a—they've restored several pieces of the courthouse. The statue where the fountain is, the mural. Forgive me, everyone. I'm a Luddite. Good music, though. Anyone want to dance? Good music. Did you ever? Yes, of course. Go ahead. Oh, I don't know how you can keep your head. So that art fair was in the background when they adopted this events policy in 99. They were concerned at that time about county liability for a nativity scene that had been on the courthouse grounds for some time, so they wanted to avoid liability for that. They wanted to avoid having the courthouse drawn into politically sensitive conflicts. The examples given in a 99 meeting, the nativity was on their mind. I don't know that there was anything specific, but in the minutes that are in the record, they cited the Boy Scouts versus gay rights activists and pro-life versus pro-choice activists, and they just didn't want the courthouse to be drawn into those sorts of things. But like I said, they wanted to craft a policy that allowed them to still be part of and have the Round the Fountain Art Fair downtown. So they sponsored, they came up with the sponsorship idea. Don't you believe the sponsorship idea actually brings them more into it, which is like you said, why you're here? I mean before, it's just no one's attributing the views of the Boy Scouts or the versus gay rights movement to the courthouse or to the county. Well, I think if you look at the nativity scene, it's illustrative. I think if we were here today and the event we had sponsored was the nativity scene or a nativity event, then the plaintiffs would probably be very much saying, this is government speech, this is attributable to the government. There was a case Judge Hamilton decided when he was a district court judge, was reversed on standing grounds, but at that time the Speaker of the House of Representatives, it was one of those prayer cases, and that case said that where the government controls the forum and invites the speakers, that becomes government speech, even if, as in that case, the Speaker of the House did not review the prayers beforehand. So I think the fact that we closed the forum, which we're entitled to do, you can close courthouse grounds. You've got a couple of cases from this circuit where somebody wanted to put an art display mocking a judge down in the lobby, and you said, no, you can't do that. And so we can close it down. It was there for a little while. So by closing it down and being selective about who you invite, the views become those of the government, and you're right, they are views attributable to the government, and that's, I think, important because the government's allowed to pick views, and I think that's part of what government does. They express views on behalf of the people who elected them. Well, let's assume that we concluded that the county was not engaging in government speech but that the courthouse grounds are a non-public forum. Could the county really argue that it is engaging in permissible content-based restriction as opposed to viewpoint discrimination? I mean, given the county's admission in the district court that it rejected a higher society's request because it disagreed with its message. Well, I think there's two things there. First, I'd like to clarify that. The short answer is, no, I don't think we win if it's not government speech. The longer answer is that I think the district court mischaracterized what I said at oral argument. It's not so much that we disagreed with higher society. It's that the county was not willing to take a position on their speech versus, for example, the art fair, the police memorial service, and the 95th anniversary. I think they were taking a position on those. They were agreeing with those messages, adopting them as their own, and elevating them by putting them in a public space that was not, or a symbolic space, I should say, that was not otherwise open to events at the public. In that sense, it was speaking for itself. It was promoting something valuable to the community. And I think, though, that the reason we don't win if that's not government speech is because we were selecting those views because we agreed with them, the police service and all of that. Well, we meaning, I thought there was something where one councilman or somebody, some elected person is okay with one person. Is that correct? I'm sorry? Oh, yeah, so it took place because, and that ties into this whole idea. I think there's a distinction to be made between elevating certain speech that the county thinks is important versus suppressing a particular viewpoint. And I think that what you're citing is evidence that this policy was not being used as a means to suppress higher society's viewpoint. After all, when they thought that it had gone through the normal channels, there was a mistake made. What was that? It came in kind of- What was the misunderstanding that allowed higher society to hold that first event? The communication about the event came in sort of sideways. Higher society had called the city of Lafayette. So the Topinio County Courthouse is managed by the county government, but it's in the city of Lafayette. And so higher society had placed a call to the city of Lafayette. The city of Lafayette transferred the voicemail over to one of the commissioners. One of the commissioners maybe wasn't paying attention, and so he forwarded it to his assistant to say, well, go check with courthouse security, see which doors they're okay with this happening in front of. And the assistant thought it had been approved based on that communication. So the only response to higher society was that, okay, you've got to use this side, you can't use that side. And then once it was taking place in the middle of the-in the middle of court hours, the decision was made not to stop it because higher society had good reason to think that it had been approved, but it had not been approved. And so after that took place, I, in fact, at a meeting said we had to make an announcement that this had not followed normal procedures, and we had to tighten that up for the reason that if it happened again, if we had allowed that second one to go forth without a sponsorship, I think I would have a hard time today saying that this was not some kind of a public forum that had been opened. Because the way you can get to a public forum is having a traditional public forum, or you can have it designated as a public forum. How long has the art fair been an annual event? Forty-three years, I want to say. Forty-three? Yeah. And you mentioned the, well, CRESH or whatever you want to call it. Is that still in place? No, that stopped in 1999 when this policy came up because- How long had that been going on historically? I don't know, but I think 20 to 30 years. I think it had been a long time. Because there's sort of a thing about things that are historical as opposed to just something that's here today, gone tomorrow, I guess. Yeah. I think, I don't know what the current commissioners would think. I think there was perhaps one of the commissioners at the time, she would not have, how to put this gently, she would not have been comfortable authorizing other religions to have their events there as well as that nativity. And so the decision was made that, well, if she was, her only option at that point, I think the council was at the time, is to exclude them all. You can't just let a nativity scene in this spot and not open it up to other religions. Because I think it's attributable to the county at that point. But after 1999, there were still some events that took place, not just the few you've mentioned, some that may not have been ones that you would want to sponsor. Right. Thank you. We're calling those private events in our briefing, and those are excluded. They drifted up into the courthouse grounds somewhat, but our position is that higher society has been treated exactly the same as those folks. They were denied a sponsorship. They were not told to move when they were otherwise having a sidewalk demonstration. Higher society's complaint is they want to be associated with the courthouse grounds because of the courthouse grounds' close association with the government. Well, you're saying associated with as opposed to they just want to be able to hold their event. Those are two different things. Wanting a space to hold your event is different from wanting to be associated with the court, trying to say that the court approves what they're doing. Is that what you're trying to claim? Well, I don't know about approval, but they want to be in that spot because that's where the drug laws are enforced. Their deposition says that. They were asked why not just do the sidewalk or go a block down the road to Reilly Plaza, which is a big plaza they could have it. They wanted to be there because it was special, because it was associated with the drug laws. Other than using the word sponsor, what evidence is there that the county was behind the private events held at the courthouse in any meaningful way? I want to make clear there's a distinction between the sponsored events and the private events. Planned Parenthood, Syria, all of those are private events. The sponsored events, the evidence is that there's the sponsorship agreement. They go to a public meeting. They ask for permission. At the public meeting, the commissioners approve it, and they're being allowed to have it up on the courthouse grounds where everything else is excluded. And I think having the grounds excluded to other things enhances the association with the government. I think I'm about out of time here. Well, I'll give you an extra minute. Thank you. Lady bountiful. Okay. Thank you. Hi, Mr. Falk. How are you? Fine, thank you. May it please the court. Tippecanoe County is attempting to have it both ways here. It is opening up its courthouse grounds, which is a large expanse in the middle of the city block, to private groups and expression that it favors, while at the same time using the government speech doctrine to deny access to groups and expression that it's not favored. The expression that has taken place and takes place on the courthouse grounds by the private groups is private speech, not government speech. And the admitted viewpoint discrimination against higher society is, therefore, unconstitutional, and the district court must be affirmed. Now, courthouse grounds have not been historically considered places for expressive activity and speech. Why not hold your rally on the sidewalk or at, really, Plaza down the street? I mean, certainly you could convey your general message about the prosecution of marijuana crimes by protesting near the courthouse, couldn't you? Well, I think courthouse grounds have not been considered to be public fora, but we've cited a number of cases from other circuits where individuals have gone to courthouses for the precise reason that it is the seat of governmental power, and going down a block away or even around the courthouse is not the same as appearing on the courthouse to advocate for repeal or modification of the laws that are enforced in that building. The question, then, is whether the county has opened up the courthouse grounds so that it is not allowed to engage in viewpoint discrimination, and it clearly has. It argues that the groups it has favored by allowing them to appear are engaging in government speech, but there's no indicia of government speech here. The private groups have to post an insurance policy of a million dollars to indemnify the county. They have to agree to separate indemnification. They have to agree to pay for expenses and costs, including cleanup expenses. They are given complete control over what they say and how they say it. None of that bears the indicia of government speech. Does the fact that the Planned Parenthood rally and the rally, the march, rather, in support of Syrian refugees, does the fact that they made significant use of the courthouse grounds help your case in any way? Yes, very much so, because we agree, of course, because the Supreme Court has told us, that there are times that private expression can be adopted by the government and become government speech. We have to look at three factors, history, public perception, and control. Skipping around to the public perception, the fact is that the people in Tippecanoe County view that courthouse as a place for private expression. Yes, Planned Parenthood went there, the Syrian refugee protests went there, the anti-bullying went there. They entered the courthouse without permission. They hadn't complied with this policy, but that identifies what is obvious, which is that people look at courthouses as a place for individual expression. No one is going to look at a rally of higher society taking place on the courthouse ground and say, hey, Tippecanoe County is in favor of legalization of marijuana. And that's the difference between a license plate or a statute on government property. If you have a statute on government property, people are going to see it and say, it's there because the government wants it there, or a license plate. But no one is going to look at private expression and adopt it. And in fact, if you go back to the first part of the three-part test in Walker and Sumim, you look at history. What is the history? Well, the history is government accepts statutes for its expressive purposes. Government, not just the state of Texas, but all states, has license plates for its own expression. There is no history of government allowing on courthouse grounds private expression and then adopting that as government speech. You see, there is a fine line between a permissible content-based restriction in a non-public forum and an impermissible viewpoint-based restriction. And it would be permissible for the county to conclude that it would disallow any expression on the courthouse grounds in support of illegal activity, would it not? How is that any different than what was done here? Well, for one thing, what was done here is being operated under a policy. We're challenging the policy, and the policy is clearly unconstitutional. So what you're saying is, what if they adopt a new policy saying, you're right, we do have a forum here, but we're restricting it and not allowing advocacy of unlawful actions or what have you. The problem, of course, is that you have the League of Women Voters who advocate for things, you have the Fraternal Order of Police who advocate for things. Higher society is not necessarily advocating that laws be broken, they're advocating that laws be changed. So I would say... Were those groups actually advocating when they came, or was it just commemorating, honoring people who had passed away? Well, that's the point, Your Honor. We don't know, because Tippecanoe County doesn't control what is said and how it's said. And we don't know if every other piece of artwork is promoting drug use that is around the Fountain Art Fair. I doubt it, but we don't know that, because it's not government speech, it's private speech. Yes, things could be drawn differently, and the case would be radically different, but that's not the case we have here. The case we have here is a policy, and the policy clearly allows for private speech and allows for viewpoint discrimination. Did any county employees authorize you to hang a banner, for instance, inside the courthouse building or use an amplifier on your first foray? My understanding is that they were... the group was told what stairs they could be on, and they did inform the staff that they would be using amplification. At some point, they were told they were disturbing, which they might have been. They turned the amplifier off, and now their position is they only go to courthouses around the state on Saturdays, so none of that is going to be a problem. And they're certainly willing to do that in Tippecanoe County and are planning to do that in Tippecanoe County as well. So they will not be disturbing court business, which is obviously a legitimate concern. And why were you seeking to hold the second event so soon after the first? The group got a lot of social media positive responses and wanted to go back to West Lafayette. It is a university town, which I believe has a history of advocacy. I mean, they are interested in advocating for changes in the law, and they thought that would be a good place to be. And what we have, of course, then, is private expression. The county, then, must meet the requirements of viewpoint neutrality and reasonableness. The county concedes it's not being viewpoint neutral. This is not government speech. If we go through the three factors of Suleiman Walker, as we have, it's quite clear. History, public perception, and control all show that this is private expression. And given that the county was engaging in viewpoint-based discrimination, the district court was correct and should be affirmed. Well, you know, in some places, like here, since they both live here, I come from South Bend, and occasionally there's people out here in the plaza across the street, and I'm not sure whether they show up spontaneously or they get permits. I really don't know. But that's a public place, and that's where they can sound off near the government. They've got two governments to complain about right there. So in South Bend, they have a courthouse similar to what you've described, but it's been condensed mostly because they're building other stuff around it, so there's still that kind of access. But I can look out my window and I can see people waving signs. There are other things I can't see, but apparently there are a lot of other people. I don't remember what the issue was. But I guess sidewalk versus grounds is where I'm kind of confused, because the grounds sort of become more, I don't want to call it sacred, as it gets closer to the entrance. Yes. And so there's whatever that second wall is, I forget what they call it, and then where you're out on the sidewalk walking around, that's sort of a way to keep everybody on the perimeter, and if there's enough people to go all the way around, that's a big deal. I don't know whether those need permits or not. Well, I mean, there is the psychological effect of being on the grounds of the place where the law is enforced, but from a practical standpoint, and I've never been to a higher society rally, but if there are speakers, and this is speakers wanting to advocate membership to then go on to help change the law, it makes sense for them to be elevated. And being on the stairs gives them a platform. A sidewalk rally is just people walking around in a square. If you're on the stairs, you have the opportunity to actually have a rally, have speakers, have people come up and down and address the crowd. It's more of a stage then. That's correct. That's correct. But I don't want to diminish the other factor, which is they want to be at the seat of power, and I think that is a valid consideration, and we know from the Supreme Court and from many cases that it's not up to us to tell people how they best can express themselves, as long as, of course, that we're dealing with a forum that they have the right to be in, which I believe we are. Well, I guess this really comes down to what people try to say, what is and what is not government speech. Well, of course, and that's why I think if you look at the government speech cases, not just Suleiman Walker but this court's case in Illinois Dunesland dealing with putting little placards or pamphlets on a state park kiosk, you're dealing with a much different situation than a physical space that people can be there for an hour and then leave. We haven't cited, and neither has Mr. Mass in any cases like this where the government is somehow deemed to have incorporated clearly private speech for its own that takes place on courthouse property, because I think we understand because of the First Amendment that people go to places like courthouses and government buildings to express their own private grievances and thoughts, and that's exactly what we're having here, and we have a viewpoint-based discrimination that's unconstitutional. Well, you mentioned the nativity scene as something they had done historically and then they got uncomfortable with. Obviously, you wouldn't want that. That's something that the ACLU would want to get rid of, wouldn't it? Well, no. I think if they come out and say, we're going to allow speech to take place with permit and what have you, and if someone applies for a creche and if someone applies for manure and someone, we had a case in southern Indiana similar to that with a courthouse, and it basically said, look, we will keep the grounds open for all displays. At that point, no one's going to think that any particular display is there because of the county. It's got to be there because it's a forum for that sort of display. In the same way, no one's going to look at higher society, as I said, and say, well, I guess typically county government's endorsing marijuana reform because we understand that people come to public buildings to voice their own expressive thoughts and activities. Thank you. Thank you. Thank you, Judge. If we closed the forum to other displays and had a county office of government sponsor a nativity display and put it up on the courthouse, it would absolutely be government speech at that point. What if you added a menorah and a scythe? Well, I think it still would be government speech. They would not be objecting as much. I think it would still be government speech, but it would be permissible government speech in that it didn't violate the Establishment Clause at that point. So I think you should look at the nativity displays and things of that nature, and there should be one standard for government speech that runs through all of that. And so just lastly, I'll leave it at that. That's probably my strongest argument. You sure? Yeah. Because, you know, I'm willing to give you another minute. Well, okay. I'll look at the ‑‑ he mentioned the insurance policies as indicia that it's not government speech. I think if you look at Walker, you'll see that the private groups paid application fees for the license plates, and I think if you look at that Vista Graphics case out of Virginia, especially, it was just affirmed on appeal. The Circuit Court said that even though the policy said that the private literature shall not mention endorsement by the government in it, that was still ‑‑ it was one of those pamphlet cases like the Illinois Dunesland. That was still government speech. Thank you. Thank you. Thank you, everyone. A case like every other case will be taken under advisement.